UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

DENNIS SMIERTKA,

    Plaintiff,

v.                                          Case No. 1:12-CV-99

GUARDIAN LIFE INSURANCE         HON. GORDON J. QUIST
COMPANY OF AMERICA,

    Defendant.

_____/

## OPINION

Plaintiff, Dennis Smiertka, commenced this action against Defendant, Guardian Life Insurance Company of America, under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*. Smiertka alleges that Guardian improperly denied him long-term disability benefits. Both parties have filed Motions for Judgment on the Administrative Record (docket nos. 10 & 12). After conducting a *de novo* review of the administrative record, for the reasons set forth below, the Court will grant Guardian's motion.

## I. FACTS[1]

Guardian provides long-term disability insurance to employees of Farm Bureau Life Insurance Company of Michigan, Smiertka's former employer, through a group insurance plan (Plan), number G-00424301-GC, effective December 10, 2008. The Plan is governed by ERISA. The Plan delegates to Guardian, the Plan administrator, discretionary authority to make benefit

---

[1]The following facts are taken from the Administrative Record (AR) (docket nos. 8–9).

determinations under the Plan, including eligibility determinations. (AR, Docket no. 9, Page ID 434.) The Plan provides that participants are entitled to monthly long-term disability benefits if participants satisfy various eligibility criteria, including being disabled within the terms of the Plan. The Plan defines "disability or disabled" by whether a Plan participant meets either the Occupation Test or the Earnings Test:

> **Occupation Test of Disability**[2]
>
> You meet this test if you are: (a) not working in any occupation; and (b) due to physical, mental or emotional limits, caused by a current *sickness* or *injury*, not able to perform the major duties of your *own occupation* on a full-time basis.
>
> You will not meet this test, if you are able to perform the major duties of your *own occupation* with reasonable accommodation an employer is willing to provide.
>
> The term "reasonable accommodation" means any modification or adjustment to: (i) a job; (ii) an employment practice; (iii) a work process; or (iv) the work place. The modification or adjustment must make it possible for a *disabled* person to: (1) reach the same level of performance as a similarly situated non-disabled person; or (2) enjoy equal benefits and privileges of employment as are available to a similarly situated non-disabled person. The modification or adjustment must not place an undue hardship on the employer.
>
> **Earnings Test of Disability**
>
> For any month in which you are working, you will meet this test if, due to physical, mental or emotional limits, caused by a current *sickness* or *injury*, you are not able to earn more than 80% of your *insured earnings*, in any occupation for which you are qualified by education, training or experience.

(*Id.* at 453 (italics in original).) The Plan further defines an employee's "own occupation" as:

> Your occupation as done in the general labor market in the national economy. To determine the duties and requirements of your own occupation, we use: (a) the job description provided by the *plan sponsor*; and (b) the duties and requirements of that occupation as shown in the most recent version of the Dictionary of Occupational Titles. That document is published by the Department of Labor. If the Department stops publishing that document, we have the right to use some other similar standard.

---

[2]The Plan states that terms in italics are "defined terms with special meanings," as defined at the end of the long-term disability insurance section. (*See id.* at 434, 452–56.)

2

(*Id.* at 455.) The Plan defines the plan sponsor as the employer to which the Plan is issued, in this case, Farm Bureau.

On or about January 14, 2010, Smiertka filed a long-term disability claim with Guardian. Smiertka alleged he experienced pain in his extremities and had difficulty breathing in climates under 55 degrees Fahrenheit. Smiertka also submitted an Attending Physician's Statement (APS) from Doctor Robert Allen dated January 8, 2010. Dr. Allen diagnosed Smiertka as having Agglutinin antibodies and Raynaud's Syndrome. He observed that Smiertka had difficulty working in cold weather conditions under 40 degrees, causing him to be unable to work for eight months of the year. Dr. Allen therefore recommended as a treatment program avoidance of temperatures under 40 degrees. Smiertka also provided Guardian a letter from Doctor Marcia Liepman, who stated that Smiertka has "severe Raynaud's phenomenon and problems with cold agglutinating proteins. These lead to a great deal of pain and disability. Because of this he is unable to work in cold weather." (*Id.* at 317.) Dr. Liepman also completed an APS on January 12, 2010. She recommended as a treatment plan the use of warm clothing and concluded that Smiertka had "moderate limitations of functional capacity," but was capable of clerical, administrative, or other sedentary work activity in a warm environment. (*Id.* at 320.)

On March 2, 2010, in a telephone interview with Guardian, Smiertka stated that he was first diagnosed with Raynaud's Syndrome and Cold Agglutinin in 1998, but his condition had deteriorated in recent years. He said he had difficulty being outside in temperatures colder than 65 degrees. He described his job as an insurance agent as requiring him to visit every property that he insures in person, including inspecting and taking photographs and measurements of the property. He concluded that, when working full-time, he had to spend 50 percent of his time in the field.

On April 1, 2010, Guardian conducted a medical review of Smiertka's file to determine his eligibility for long-term disability benefits. Guardian concluded that Smiertka's only restriction and limitation was working in temperatures below 40 degrees. On April 14, 2010, Mary Ann Stevenson conducted a vocational analysis to determine how Smiertka's occupation as an insurance agent is performed in the national economy. According to her notes, Stevenson reviewed the Dictionary of Occupational Titles (DOT) and Smiertka's Farm Bureau job description and concluded that Smiertka's limitations were related to his job duties performed for his specific employer and his geographic location rather than the overall occupational requirements of his occupation. (*Id.* at 342.) The DOT describes the environmental conditions of "Sales Agent, Insurance," listing 250.257-010, as "never" involving exposure to: weather, extreme cold, extreme heat, wet and/or humid conditions, or atmospheric conditions. It appears that the Farm Bureau job description upon which Stevenson relied is Guardian's Physical Demands Job Description and Requirements form, which Smiertka completed upon Guardian's request. (*See id.* at 303, 342.) On the form, Smiertka stated his job involved traveling to and from appointments at clients' homes, farms, and businesses, including meeting and providing services "out of doors." (*Id.* at 304.)

On or about April 29, 2010, Guardian denied Smiertka's claim, finding that the medical information provided in support of his claim did not support the conclusion that Smiertka was unable to work in his own occupation. Guardian stated that Smiertka's physicians documented a physical restriction from performing job duties while exposed to a temperature of fewer than forty degrees. However, Guardian explained, the occupation of insurance agent does not require an agent to be exposed to "extreme cold, extreme heat, wet and/or humid weather or atmospheric conditions." (*Id.* at 234.)

On or about September 16, 2010, Smiertka appealed Guardian's denial of benefits. He supplied Guardian with additional evidence of his disability, including medical records, copies of Smiertka's appointment book entries, Michigan weather information, and a letter from Trent Rappuhn, Managing Partner of Farm Bureau's Western Region office, describing the duties of a Farm Bureau insurance agent that require exposure to outside temperatures. In support of his appeal, Smiertka argued that (1) Guardian failed to consider Smiertka's Farm Bureau job description in determining the major duties of Smiertka's own occupation, and (2) Guardian only applied the Occupational Test and should have also applied the Earnings Test for determining disability.

In his letter, Rappuhn provided Guardian with a list of "basic functions" of Farm Bureau agents that "necessitat[e] an agent to be outside of temperature controlled environments during all seasons of Michigan's climate." (*Id.* at 70.) The list included the measurement and inspection of new property for which an applicant is seeking insurance, periodic inspection of insured properties, photography and inspection of claimed damage to insured property, and visiting potential and existing clients to discuss policies. Rappuhn noted that failure to inspect claimed damage would "cause the agent to be considered to be an inferior agent compared to [his] peers [and] therefore, clients will seek out an agent willing/able to do this." (*Id.*)

Smiertka also submitted an excerpt from Farm Bureau's Marketing Administration Manual detailing a Farm Bureau agent's responsibilities. The manual requires agents to "submit enough photos to show all sides of each dwelling and all other structures on the premises," and notes that an agent is the "on the spot Underwriter" and shares, with the Field Underwriter, responsibility for the selection of quality risks. (*Id.* at 72–73.) A Farm Bureau agent must also review a business

5

premises for evidence of good housekeeping and maintenance practices, such as inspecting for worn carpeting and uneven sidewalk and parking lot surfaces. (*Id.* at 75.)

On October 18, 2010, Stevenson conducted another vocational review of the information submitted by Smiertka. She noted that Smiertka's job duties were "far more diverse" than the DOT job description of insurance sales agent: "In order to serve his client base, that of a multi-county farming community, [Smiertka] was required to act as a field underwriter, provide on-site visual inspections, property measurements and photographs of farm buildings to determine replacement costs and personally investigate any and all claims related matters. This he did out of the office on a daily basis subject to all weather conditions." (*Id.* at 358.) Stevenson drew the following conclusions:

> Though the DOT does not acknowledge 'environmental conditions' such as exposure to weather, extreme cold or heat as an occupational requirement, many insurance agents must perform their respective material duties out of the office, whether investigating circumstances related to accidents, theft, collisions, fires, etc. or meeting with prospective customers. In the claimant's case, the great majority of his occupation was performed out of doors on a regular basis. Given that his client base and source of income was developed and maintained over three decades, it is only reasonable to acknowledge the geographical area, climate and temperature factors as significant in the appeal of this claim and their influence on limiting the claimant's ability to perform his essential duties during 'all' months of the calendar year.

(*Id.* at 358.)

On or about June 27, 2011, Guardian obtained an "independent" Job Analysis Report from Helen Swartz, M.Ed. of WorkRite Consulting, LLC. In order to survey the day-to-day duties of other multi-line insurance sales agents, Swartz solicited by telephone information from insurance agents in Allegan and Grand Rapids, Michigan, and received seven responses. During the qualitative interviews, she asked respondents to describe how much time they spend in the office compared to outside the office "on the road." (*Id.* at 409.) The loose consensus among respondents

6

was that the insurance sales business has changed: more business is conducted by telephone and the internet, and agents rarely travel outside for business; many companies hire third-party home inspectors or independent appraisers. Swartz did not interview any agents from Farm Bureau.

The parties agreed to allow Smiertka until July 5, 2011, to submit further medical documentation of his disability. Smiertka submitted a letter from Dr. Allen dated June 30, 2011, describing Smiertka's worsening condition and noting that due to his condition, it was "medically unreasonable" for Mr. Smiertka to work in an environment of less than 60 degrees. Smiertka also submitted a letter from Dr. Liepman documenting that Smiertka developed severe cyanosis of extremities, nose, and ears when exposed to temperatures of 60 degrees or below. (*Id.* at 392.)

On or about August 16, 2011, Guardian informed Smiertka that it had upheld its denial of Smiertka's claim for disability benefits. Guardian stated that it had reviewed the documents Smiertka had submitted in support of his appeal, including the Rappuhn letter describing the outdoor responsibilities of Farm Bureau agents and Farm Bureau's marketing manual. Identifying Smiertka's title as a "multiple line insurance career agent," Guardian concluded that Smiertka was not disabled from performing his own occupation as defined by the Plan. Guardian observed that although Smiertka could not perform field underwriting responsibilities as required by Farm Bureau, he was not precluded from performing the major duties of an insurance sales agent.

On February 1, 2012, Smiertka commenced this action. Smiertka's Complaint consists of two counts: (1) an ERISA claim to recover disability benefits wrongly denied, and (2) an ERISA claim to recover damages for breach of a fiduciary duty.

## II. STANDARD OF REVIEW

The threshold issue that the Court must decide is the applicable standard of review.[3] Generally, in an ERISA case, a court reviews a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956–57 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998). However, Michigan Administrative Code Rule 500.2202(b) modifies that standard because it prohibits provisions granting discretionary authority to insurance companies in group insurance policies issued after July 1, 2007. *See* Mich. Admin. Code R. 500.2202(b). The Sixth Circuit has held that ERISA does not preempt state administrative rules that prohibit discretionary clauses. *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 608–09 (6th Cir. 2009). In effect, Rule 500.2202 voids discretionary clauses in insurance policies issued after July 1, 2007, thus requiring a reviewing court to apply a *de novo* standard of review. *See id.*

The *de novo* standard of review applies to both factual determinations and legal determinations by a plan administrator. *Rowan v. Unum Life Ins. Co. of Am.*, 119 F.3d 433, 435 (6th Cir. 1997). "In the ERISA context, the role of the reviewing federal court is to determine whether the administrator or fiduciary made a correct decision, applying a *de novo* standard." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). "This review is limited to the administrative record and the court is obligated to determine whether the administrator properly interpreted the plan and if the insured was entitled to benefits under the plan." *Kaye v. Unum Grp./Provident Life and Accident*, No. 09-14873, 2012 WL 124845, at * 5 (E.D. Mich. Jan. 17, 2012) (citing *Perry*, 900 F.2d

---

[3]As an initial matter, the Sixth Circuit has held that summary judgment is inappropriate for reviewing denial of benefit claims under ERISA. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998); *see also* ERISA Case Management Order, Docket no. 7, Page ID 18–19.

at 967). "The administrator's decision is accorded no deference or presumption of correctness." *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002) (citing *Perry*, 900 F.2d at 966). "When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998) (citations omitted).

In this case, the Court agrees that the *de novo* standard is appropriate because the Plan has an effective date of December 10, 2008.[4]

### III. DISCUSSION
### A. Own Occupation

Smiertka offers two arguments for why Guardian incorrectly denied him benefits under the terms of the Plan: first, Guardian ignored Smiertka's actual job description in determining Smiertka's own occupation,[5] and second, Guardian ignored the Earnings Test in favor of the Occupation Test.

First, the Plan defines "own occupation" as the employee's occupation as done in the general labor market of the national economy. (AR, Docket no. 9, Page ID 455.) To determine the duties and requirements of that occupation, according to the Plan, Guardian uses (a) the job description of the employer; and (b) the description of the occupation in the DOT. (*Id.*) The Plan does not require Guardian to afford the sources equal consideration, but merely to consider the sources together.

---

[4] The Plan has a rider between Guardian and Farm Bureau dated April 1, 2007. (AR, Docket no. 9, Page ID 649.) However, the Plan appears to have been amended on December 10, 2008. (*Id.* at 658.) Rule 500.2202(b) states that the prohibition on discretionary clauses does not apply to a contract document in use before July 1, 2007, but does apply to any such document revised in any respect on or after that date. Mich. Admin. Code R. 500.2202(b). Therefore, the Court determines the effective date to be December 10, 2008.

[5] The Court notes that Smiertka does not challenge Guardian's use of DOT's "Sales Agent, Insurance," listing 250.257-010, instead of a job description for a field underwriter or an analogous position.

9

Because the crux of the inquiry is how the occupation is performed in the national economy, Guardian may reasonably find the DOT's description of major duties of an insurance agent more relevant to its inquiry than a specific job description. Giving one source more weight than another does not violate the terms of the Plan. Since Smiertka does not challenge that he is an insurance sales agent, and does not challenge the applicability of the DOT's "Sales Agent, Insurance" job description to his experience and training, the Court finds that Guardian did not err in defining Smiertka's own occupation within the terms of the Plan. *Cf. Osborne v. Hartford Life and Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006) (finding as "reasonable" an administrator's use of the DOT to determine participant's "own occupation" instead of "examining in detail the specific duties the employee performed"). On the basis of the record before this Court, the evidence supports that Smiertka could perform the major duties of his own occupation—insurance agent—as it is performed in the national economy, such as for another employer, even if he is unable to perform all the major duties of his job at Farm Bureau.

Smiertka also argues that the Plan does not address which job description controls when there is conflict between a plan sponsor's job description and the DOT. Smiertka argues that the Court should apply the contract interpretation principle of *contra proferentem*, construing any ambiguity against Guardian. However, the Court concludes, as did the Sixth Circuit in a similar case, that this case "does not involve the interpretation of ambiguous contractual language that should be construed against the drafter of the contract," because the dispute is not over the meaning of the term "own occupation," but rather over the methodology Guardian used to determine Smiertka's "own occupation." *See Osborne*, 465 F.3d at 300.

Smiertka also argues that Guardian's methodology was incorrect because of the conflict of interest in Guardian's role as Plan administrator and insurer. However, "[i]n ERISA benefits cases, conflict of interest discovery can only be relevant if the standard of review is abuse of discretion. If ... the standard of review is *de novo*, then conflict of interest discovery is irrelevant." *Daul v. PPM Energy, Inc.*, No. 08-CV-524-AC, 2010 WL 3945001, at *10 (D. Or. Oct. 6, 2010); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

### B. Earnings Test

Finally, Smiertka argues that Guardian wrongly denied him benefits because Guardian failed to analyze Smiertka's limitations under the alternative Earnings Test of Disability. According to the Plan, a Plan participant is disabled if he meets either the Occupation Test or the Earnings Test. The Earnings Test states that for any month in which a participant is working, he will meet the Earnings Test if, due to physical, mental, or emotional limits caused by a current sickness or injury, he is not able to earn more than 80 percent of his insured earnings in any occupation for which he is qualified by education, training, or experience. (*Id.* at 453.)

As Guardian explained in its appeal denial letter to Smiertka, the Earnings Test is not pertinent to Smiertka because his last day of work was December 30, 2009, so he had no months of work during which to incur earnings to become eligible under the Earnings Test. Because the Earnings Test is explicitly limited to "any month in which the covered person is working," the test does not apply to Smiertka. Smiertka offers no support for any other interpretation of the Plan.

### C. Breach of Fiduciary Duty

In Count 2, Smiertka alleges Guardian breached its fiduciary duty by denying Smiertka disability benefits. Under 29 U.S.C. § 1132(a)(3), ERISA allows a plan participant to "obtain other appropriate equitable relief" to redress violations of ERISA or enforce the terms of the plan. However, where § 1132(a)(1)(B) would provide adequate relief, a plaintiff is not entitled to an additional avenue to relief. *See Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S. Ct. 1065, 1079 (1996) (finding where a plaintiff could proceed under § 1132(a)(1), equitable relief under § 1132(a)(3) was foreclosed). In this case, Smiertka is a plan participant who seeks recover, under Count 1, "benefits due to him under the terms of his plan." § 1132(a)(1)(B). If Smiertka's Count 1 claim had legal merit, Smiertka would be eligible to proceed under § 1132(a)(1), so his claim for equitable relief under § 1132(a)(3) is foreclosed.

After *de novo* review of the administrative record, the Court has not identified any error from which to conclude that Guardian's denial of disability benefits was incorrect. Thus, the Court must grant judgment on the administrative record in favor of Guardian.

### III. CONCLUSION

For the foregoing reasons, the Court will enter judgment on the administrative record in favor of Guardian. An order consistent with this Opinion will be entered.

Dated: March 28, 2013                                              /s/ Gordon J. Quist
                                                                                         GORDON J. QUIST
                                                                           UNITED STATES DISTRICT JUDGE